## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ILLINOIS REPUBLICAN PARTY, WILL COUNTY REPUBLICAN CENTRAL COMMITTEE, SCHAUMBURG TOWNSHIP REPUBLICAN ORGANIZATION, and NORTHWEST SIDE GOP CLUB | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 20 C 3489 |
| v. | ) ) | Judge Sara L. Ellis |
| JB PRITZKER, in his official capacity as Governor of the State of Illinois, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In response to the ongoing COVID-19 pandemic, Defendant JB Pritzker, Governor of Illinois, has issued a series of executive orders including Executive Order 2020-43 ("Order"), at issue here.[1] The Order prohibits gatherings greater than fifty people but exempts the free exercise of religion from this limit. Doc. 12 at 3, 6.[2] Plaintiffs Illinois Republican Party, Will County Republican Central Committee, Schaumburg Township Republican Organization, and Northwest Side GOP Club challenge this exemption as violating their rights under the First and Fourteenth Amendments. Plaintiffs allege that by exempting the free exercise of religion from the general gathering limit, the Governor has created an unconstitutional content-based restriction on speech. Plaintiffs also claim that by not enforcing the Order against protestors

---

[1] Just prior to the hearing in this case, the Governor issued the Executive Order 2020-43 on June 26, 2020, which supersedes all previous Covid-19 Executive Orders. The prior Executive Order, in operation at the time of filing of the lawsuit, was EO 2020-38. The significant difference between the two orders is that EO 2020-38 limited public gatherings to ten persons while EO 2020-43 increases that number to fifty. Both orders provide the same exemption to religious gatherings, which is basis for Plaintiffs' complaint. Because the operative order is EO 2020-43, the Court will refer to that Order throughout this Opinion.

[2] The Court uses the internal pagination for the Order.

following the death of George Floyd, the Governor has created another exception. Plaintiffs

filed a complaint and a motion for a temporary restraining order ("TRO") and preliminary

injunction in this Court on June 15, 2020 [3] because they want to hold political party events

larger than fifty people, including a picnic on July 4th. Plaintiffs seek a declaration stating that

treating political party gatherings differently than religious gatherings violates the First and

Fourteenth Amendments. Plaintiffs also ask the Court to enjoin the Governor from enforcing the

Order against political parties. Because Plaintiffs' likelihood of success on the merits is less than

negligible and the balance of harms weighs heavily against Plaintiffs, the Court denies their

motion [3].

## BACKGROUND

The world is currently facing a major global pandemic – one of the most significant

challenges our society has faced in a century. There is no cure, vaccine, or effective treatment

for COVID-19. As of June 30, more than 126,739 Americans have died due to the virus,[3]

including approximately 6,923 Illinois residents.[4] In Illinois, there are more than 143,185

confirmed cases.[5] Despite efforts to slow the spread of COVID-19, many states are experiencing

a rise in new cases. Medical experts agree that to stop the spread of COVID-19, people should

practice social distancing and wear face coverings when near other people outside their homes.

Federal, state, and local governments have enacted measures to reduce the spread of this highly

---

[3] *Coronavirus Disease 2019 cases in the U.S.*, Center for Disease Control and Prevention,
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] *Coronavirus Disease 2019 (COVID-19) in Illinois*, Illinois Department of Public Health,
http://www.dph.illinois.gov/covid19.

[5] *See id.*

contagious and easily transferable virus while remaining sensitive to economic concerns and citizens' desire to resume certain activities.

In Illinois, following stay-at-home orders, the Governor developed a multi-stage plan to "safely and conscientiously resume activities that were paused as COVID-19 cases rose exponentially and threatened to overwhelm [the] healthcare system." Doc. 10-1 at 5. On May 29, 2020, the Governor issued an Order related to this plan. The Order provides that "[a]ny gathering of more than ten people is prohibited unless exempted by this Executive Order." *Id.* at 6. The Order exempts free exercise of religion, emergency functions, and governmental functions. Relevant here, with respect to free exercise of religion, the Order states that it:

> [D]oes not limit the free exercise of religion. To protect the health and safety of faith leaders, staff, congregants and visitors, religious organizations and houses of worship are encouraged to consult and follow the recommended practices and guidelines from the Illinois Department of Public Health. As set forth in the IDPH guidelines, the safest practices for religious organizations at this time are to provide services online, in a drive-in format, or outdoors (and consistent with social distancing requirements and guidance regarding wearing face coverings), and to limit indoor services to 10 people. Religious organizations are encouraged to take steps to ensure social distancing, the use of face coverings, and implementation of other public health measures.

*Id.* at 9. The Governor issued the most recent executive order, EO 2020-43, on June 26, 2020. That order increases the gathering limit to fifty people but retains the exemption for free exercise of religion. *See* Doc. 12 at 3, 6.

Plaintiffs allege that by merely "encourag[ing]" religious organizations and houses of worship to consult the IDPH guidelines, the Order treats religious speech differently. Plaintiffs contend that the Illinois Republican Party and its local and regional affiliates typically gather in groups greater than ten people for formal business meetings, informal strategy meetings, and other events. Plaintiffs believe there is particular time pressure to conduct meetings and events

3

in the five months leading up to the 2020 general election. Plaintiffs allege that their "effectiveness is substantially hampered by [the Party's] inability to gather in person." Doc. 1 ¶ 14. According to Plaintiffs, "[p]olitics is a people business" that is "most effective when people can connect in person." *Id.* Plaintiffs hope to resume all gatherings greater than ten people, including gatherings amongst "staff, leaders, consultants, members, donors, volunteers, activists, and supporters." *Id.* In their motion for preliminary relief, Plaintiffs specifically reference an outdoor picnic that they hope to have on July 4, 2020, as well as a rally and indoor convention at some point.

Plaintiffs also criticize the Governor's enforcement of the Order. Plaintiffs allege that the Governor has declined to enforce his executive order against protestors following the death of George Floyd. *Id.* ¶ 17. According to Plaintiffs, the Governor has characterized these protestors as "exercising their First Amendment rights" and has engaged in one such protest himself. Plaintiffs allege that the Governor has discriminated in favor of certain speakers based on the content of their speech; "in this case religious speech versus political speech, or protest speech versus Republican speech." *Id.* ¶ 21.

Additionally, Plaintiffs challenge the authority on which the Order rests. Plaintiffs contend that the Illinois Emergency Management Agency Act ("Act") permits the Governor to issue a disaster declaration for up to thirty days in response to a public health emergency. Plaintiffs allege that the Office of the Attorney General of Illinois "has concluded that the text of the Act does not permit successive declarations based on the same disaster." *Id.* ¶ 28. Therefore, according to Plaintiffs, the Governor only has authority to issue one thirty-day disaster declaration, rendering any further COVID-19 declaration ultra vires. Consequently, the Order is

also ultra vires because it relies on the Governor's authority under the fifth declaration. Plaintiffs' motion for preliminary relief does not address this aspect of their complaint.

## LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The party seeking such relief must show: (1) it has some likelihood of success on the merits; (2) there is no adequate remedy at law; and (3) it will suffer irreparable harm if the relief is not granted. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).[6] If the moving party meets this threshold showing, the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quoting *Planned Parenthood*, 896 F.3d at 816). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (citing *Planned Parenthood*, 896 F.3d at 816). Finally, the Court

---

[6] Although *Planned Parenthood* involved a preliminary injunction, courts use the same standard to evaluate TRO and preliminary injunction requests. *See USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 (N.D. Ill. 2019) ("The standards for granting a temporary restraining order and preliminary injunction are the same.") (citing cases).

considers whether the injunction is in the public interest, which includes taking into account any effects on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## ANALYSIS

In First Amendment cases, the likelihood of success on the merits "is usually the decisive factor." *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). "The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Barland*, 751 F.3d at 830 (same). Therefore, the Court limits its analysis to the likelihood of success on the merits and the balance of harms.

## I.    Likelihood of Success on the Merits

"[T]he threshold for demonstrating a likelihood of success on the merits is low." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "[T]he plaintiff's chances of prevailing need only be better than negligible." *Id.* In their motion for preliminary relief, Plaintiffs argue that they are likely to succeed on their claims because the Order favors religion and is therefore an unconstitutional content-based restriction on speech. Additionally, Plaintiffs argue that by not enforcing the Order against protestors following the death of George Floyd, the Governor is favoring that speech over Plaintiffs' political speech. The Governor contends that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), provides the appropriate standard by which to evaluate the Order. Additionally, the Governor argues that the Order does not distinguish between speakers but instead regulates conduct and therefore strict scrutiny does not apply.

6

### A.    *Jacobson v. Massachusetts*

"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *S. Bay United Pentecostal Church v. Newsom* (*S. Bay II*), 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38).  When state officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."  *Id.* (alteration in original) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).  Over a century ago in *Jacobson*, the Supreme Court developed a framework by which to evaluate a State's exercise of its emergency authority during a public health crisis.  There, the Court rejected a constitutional challenge to a State's compulsory vaccination law during the smallpox epidemic.  *See generally Jacobson*, 197 U.S. 11.  *Jacobson* explained that "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."  *Id.* at 27.  The Court reasoned that the Constitution does not provide an absolute right to be "wholly freed from restraint" at all times, as "[t]here are manifold restraints to which every person is necessarily subject for the common good."  *Id.* at 26.  Therefore, while "individual rights secured by the Constitution do not disappear during a public health crisis," the government may "reasonably restrict[ ]" rights during such times.  *See In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020).  Judicial review of such claims is only available in limited circumstances.  *See S. Bay II*, 140 S. Ct. at 1613–14 (Roberts, C.J., concurring) (where state officials do not exceed their broad latitude during a pandemic "they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people" (citation omitted)); *Jacobson*, 197 U.S. at 31.  If a State implements emergency measures during an epidemic that

curtail individual rights, courts uphold such measures unless they have "no real or substantial relation" to public health or are, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.*; *see also In re Abbott*, 954 F.3d at 784.

There is no doubt that Illinois is in the midst of a serious public health crisis, as contemplated in *Jacobson*. *See Elim Romanian Pentecostal Church v. Pritzker* (*Elim II*), No. 20-1811, 2020 WL 3249062 (7th Cir. June 16, 2020) (citing *Jacobson* and explaining that courts do not evaluate orders issued in response to public-health emergencies by the usual standard); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *7 (N.D. Ill. May 3, 2020) (COVID-19 qualifies as a public health crisis under *Jacobson*). Plaintiffs agree that Illinois has a compelling interest in fighting the pandemic. However, they suggest *Jacobson* is inapplicable because they do not assert an inherent right to gather but instead request equal treatment when others are permitted to gather. *Jacobson* draws no such distinction and instead provides for minimal judicial interference with state officials' reasonable determinations. The Order undoubtedly relates to public health and safety because it minimizes the risk of virus transmission by limiting gathering size. Additionally, the Order still encourages religious organizations to limit indoor services to fifty people and implement other public health measures. Plaintiffs have not shown how this exemption is a plain invasion of their constitutional rights. The Order involves reasonable measures intended to protect public health while preserving avenues for First Amendment activities. Overall, the Court concludes that Plaintiffs have a less than negligible chance of prevailing on their constitutional claims because the current crisis implicates *Jacobson* and the Order advances the Governor's interest in protecting the health and safety of Illinois residents.

B.    **Traditional First Amendment Analysis**

Even if this case falls outside *Jacobson*'s emergency crisis standard, Plaintiffs have failed to show a likelihood of success under traditional First Amendment analysis.[7]  The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that "abridge[e] the freedom of speech."  U.S. Const. amend. I.  Pursuant to that clause, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  Laws that target speech based on its communicative content are "presumptively unconstitutional."  *See id.*  Here, the parties dispute whether the Governor's actions, through both the Order and his failure to enforce it against protestors, are content neutral.  According to Plaintiffs, the Governor has distinguished between speech based on its content (*i.e.*, religious v. political or Black Lives Matter v. Republican), therefore creating a content-based restriction.  *See* Doc. 3-1 at 10.  The Governor argues that the Order is instead a content-neutral time, place, and manner regulation.  The Court evaluates content-based restrictions under strict scrutiny but assesses content-neutral "time, place, or manner" restrictions under an intermediate level of scrutiny.  *Price v. City of Chicago* (*Price II*), 915 F.3d 1107, 1109 (7th Cir. 2019).

At the outset, the Court addresses the specific governmental actions that Plaintiffs challenge.  The complaint and motion for preliminary relief treat the Order and enforcement of the Order as contributing to the same First Amendment violation.  Plaintiffs fail to distinguish between the two governmental actions or acknowledge that each action raises separate and distinct questions.  The Order provides a clear exemption for religious gatherings on its face.

---

[7] The Court limits its analysis to the First Amendment because Plaintiffs' Fourteenth Amendment claim is derivative of their First Amendment claim, and the parties agree that the claims rise and fall together.

Enforcement of the Order against protestors, however, does not create a *de facto* exemption unless Plaintiffs can show that the Governor has enforced it differently against protestors based on the content of their message.  At the hearing, Plaintiffs could not provide a single example of state officials engaging in such discriminatory enforcement.  In their brief, Plaintiffs allege that City of Chicago officials dispersed "Reopen Illinois" protestors on one occasion, but that is irrelevant to Plaintiffs' claim because it does not involve State action.  Plaintiffs have failed to point to a single instance in which they, or anyone similarly situated, protested with political messages and *state officials* enforced the Order against them because of this content.  Thus, the Court has no basis by which to evaluate whether the Governor has selectively enforced the Order.  *See Anderson v. Milwaukee Cty.*, 433 F.3d 975, 980 (7th Cir. 2006) (rejecting the plaintiff's argument that discretionary enforcement resulted in discrimination against religious literature in part because the plaintiff did not offer evidence that anyone had been able to distribute nonreligious literature under similar circumstances); *S. Labor Party v. Oremus*, 619 F.2d 683, 691 (7th Cir. 1980) ("An individual must allege facts to show that while others similarly situated have generally not been prosecuted, he has been singled out for prosecution, and that the discriminatory selection of him was based upon an impermissible consideration such as . . . the desire to prevent his exercise of constitutional rights."); *cf. Hudson v. City of Chicago*, 242 F.R.D. 496, 509 (N.D. Ill. 2007) (for plaintiffs to prevail on their selective enforcement claim, they must show they were exercising their First Amendments rights and were arrested or ticketed under the relevant ordinance when other similarly situated individuals were not). Instead, the facts before the Court indicate that the Governor similarly did not take action against "Reopen Illinois" protests that occurred on state property.  And while Plaintiffs emphasize the Governor's decision to march in one demonstration as showing that he has engaged in content-

based discrimination, this singular act is not enough to establish such discrimination. *See Tri-Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016) (public officials "enjoy the right of free speech under the First Amendment").[8] Overall, Plaintiffs have failed to point to anything that suggests selective enforcement against protestors based on the content of their message, and the Governor's participation in one protest does not give rise to content-based discrimination in violation of the First Amendment. Accordingly, the Court will limit its analysis to Plaintiffs' claim that the Order's religious exemption violates their First Amendment rights.

### 1. Content Neutrality

To determine whether a challenged regulation is content based, the Court first asks whether the regulation "draws distinctions [on its face] based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (citation omitted). *Reed* explained that facial distinctions include those which define regulated speech "by particular subject matter" or "its function or purpose." *Id.* at 163. Laws that are facially content-neutral may still be considered content-based restrictions on speech if they "'cannot be justified without reference to the content of the regulated speech' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Price II*, 915 F.3d at 1118 (a law is content based "if enforcement authorities must 'examine the content of the message that is conveyed to determine whether a

---

[8] Plaintiffs' reliance on *Soos v. Cuomo* is not persuasive. *Soos v. Cuomo*, No. 20-00651-GLS-DJS, 2020 WL 3488742 (N.D.N.Y. June 26, 2020). *Soos* concluded that plaintiffs were likely to succeed on their free exercise claim when government officials selectively enforced their order against religious groups but not protestors and allowed outdoor graduation ceremonies (with a larger numbers of individuals than allowed to religious gatherings) to occur, finding no compelling justification to treat graduation ceremonies and religious gatherings differently. *Id.* at *11–12. Further, one official made comments distinguishing between outdoor religious gatherings and protests, indicating that mass protests deserve better treatment than religious gatherings. *Id.* at *5, 12. Here, the Court finds that the Governor has provided a compelling justification for the Order's religious gathering exemption, which is narrowly tailored and outside this exemption, has not indicated a preference for one type of mass gathering over another.

violation has occurred'" (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014))).  In other words, following *Reed*, "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015).

The Order is a content-based restriction.  The Order broadly prohibits any gathering of more than fifty people but exempts the free exercise of religion from this requirement.  Instead, religious organizations "are encouraged to consult and follow" the IDPH's recommended guidelines and practices.  Doc. 10-1 at 9.  On its face, the Order distinguishes between religious speech and all other forms of speech based on the message it conveys.  *See Norton*, 806 F.3d at 413 (Manion, J., concurring) ("*Reed* now requires any regulation of speech implicating religion . . . to be evaluated as content-based and subject to strict scrutiny."); *cf. Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1297 (7th Cir. 1993) ("[N]o arm of government may discriminate against religious speech when speech on other subjects is permitted in the same place at the same time."); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 63 F.3d 581, 586, 592 (7th Cir. 1995) (prohibition of menorah's message because of religious perspective was unconstitutional under the First Amendment's free speech clause).  By providing an exemption, the Order is "endorsing" religious expression compared to other forms of expression.  *See Reed*, 576 U.S. at 168–69 (the town's ordinance singled out specific subject matter for different treatment: ideological messages received more favorable treatment than political messages, and political messages received more favorable treatment than messages announcing assemblies of like-minded individuals); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017) (political speech exception from anti-robocall statute would be content discrimination in violation of *Reed*).

12

Additionally, enforcement of the Order reiterates that it is content based. To determine whether a gathering violates the Order, authorities must look to the content of the message communicated. *See Price II*, 915 F.3d at 1118 ("[D]ivining purpose clearly requires enforcement authorities 'to examine the content of the message that is conveyed.'" (quoting *McCullen*, 573 U.S. at 479)). If the content is religious, a gathering greater than fifty people is permissible; if the content is not religious, such gathering is impermissible. *See Swart v. City of Chicago*, No. 19-CV-6213, 2020 WL 832362, at *8 (N.D. Ill. Feb. 20, 2020) (assessing the speaker's intent requires the City to evaluate the content of the speech, making its enforcement content-based). Overall, the fact that one group of speakers can gather because they are expressing religious content while Plaintiffs cannot gather to express political content causes this restriction to be content based.

The Governor contends that the Order does not distinguish between groups of speakers but instead regulates conduct. This argument is not persuasive because conduct-based regulations are still impermissible under the First Amendment if they draw distinctions based on the speech expressed. *Cf. Left Field Media LLC v. City of Chicago*, 822 F.3d 988, 990 (7th Cir. 2016) (evaluating regulation of conduct under *Reed* and finding it was content-neutral because it regulated all sales alike); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015) (city's zoning rule that required all property owners to seek permit before making changes on land was generally applicable and did not discriminate based on content of speech); *see also Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000) ("[T]he First Amendment tolerates greater interference with expressive conduct, provided that this interference results as an unintended byproduct from content-neutral regulation of a general class of conduct."). The Governor argues that Plaintiffs point to types of events they cannot hold, not expression that the

Order prohibits. This confuses the relevant First Amendment inquiry. Again, the Order prevents a group of fifty-one individuals from discussing their political platform in person but allows the same group to discuss their religion in person and is therefore a content-based restriction. The Order does not regulate all gatherings the same but instead distinguishes them based on their expressive conduct. *Cf. Left Field*, 822 F.3d at 990 (ordinance regulating peddling applied equally to sale of bobblehead dolls, baseball jerseys, and printed matter was content neutral); *cf. Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 288 (7th Cir. 2014) (requirements that small groups obtain permit to gather must comport with First Amendment and be content-neutral); *Marcavage v. City of Chicago*, 659 F.3d 626, 635 (7th Cir. 2011) ("[P]ermit requirement is less likely to be content-neutral and narrowly tailored when it is intended to apply even to small groups.").

Additionally, the Governor's reliance on *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006), is misplaced. *Rumsfeld* evaluated whether the Solomon Amendment, which denied federal funding to higher education institutions that had a policy or practice that prevented the military from gaining equal access to campuses for recruiting as other employers, violated the plaintiffs' free speech rights. *See id.* at 55. The Court found that the Solomon Amendment regulated conduct, not speech, because it "affect[ed] what law schools must *do*—afford equal access to military recruiters—not what they may or may not say." *Id.* at 60. The Court explained that the Amendment did not "limit what law schools may say" and "the conduct regulated by the Solomon Amendment is not inherently expressive." *Id.* at 60, 66. Instead, the law schools had to provide explanatory speech to explain why they were treating military recruiters differently. *Id.* The Governor analogizes this case to *Rumsfeld* because the act of gathering more than fifty people in person does not signal anything unless accompanied by

14

expressive conduct. However, unlike the law at issue in *Rumsfeld*, the Order *does* regulate speech by selecting which speech is permissible for an in-person group larger than fifty people. The Governor's argument that the gathering limit is comparable to a building occupancy limit also fails. A building occupancy limit that did not apply to certain groups based on the content of their speech would similarly be discriminatory. Building occupancy limits and gathering limits are comparable to zoning ordinances for purposes of the Governor's argument, and courts have consistently assessed whether such ordinances are content based. *See BBL*, 809 F.3d at 325 (zoning ordinances that limit where sexually oriented businesses can operate "are content based, and we should call them so" (quoting *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring))); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 980 (N.D. Ill. 2003) (ordinance that limited locations of religious institutions regulated speech not non-expressive conduct for First Amendment freedom of speech claim). When a gathering is still allowed based on the speech involved, the government has engaged in content-based discrimination. The Court finds that by exempting free exercise of religion from the gathering limit, the Order creates a content-based restriction.

### 2. Strict Scrutiny

Because the exemption is a content-based restriction, this provision can only stand if it survives strict scrutiny. *Reed*, 576 U.S. at 171. Therefore, the Governor must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). Plaintiffs concede that the Governor has a compelling interest in "fighting a pandemic," so the Court limits its analysis to whether the Order is narrowly tailored to further that interest. Doc. 3-1 at 12. It is the Governor's burden to demonstrate that the Order's differentiation between

religious gatherings and other gatherings furthers its interest in limiting the spread of COVID-19 and is narrowly tailored to that end.  *See id.*

"Generally, 'a statute is narrowly tailored only if it targets and eliminates no more than the exact source of the evil it seeks to remedy.'"  *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006) (quoting *Ward*, 491 U.S. at 804).  That is, "a statute is not narrowly tailored if 'a less restrictive alternative would serve the Government's purpose.'"  *See id.* (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000)).  The Governor argues that the Order is narrowly tailored to its compelling interest in fighting a pandemic by exempting free exercise of religion from its gathering limit because the First Amendment, federal law, and state law provide religious organizations unique safeguards against governmental interference with the free exercise of religion.  In other words, the Governor contends that by exempting free exercise of religion while still encouraging those organizations to take specific measures to prevent the spread of COVID-19, the Order is narrowly tailored.  In support, the Governor references religious exemptions that appear throughout federal and state law.  *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (recognizing "ministerial exception" to Title VII's prohibition on religious discrimination in employment and explaining that by imposing an unwanted minister "the state infringes the Free Exercise Clause"); 775 Ill. Comp. Stat. 35/15 (exemption from generally applicable government regulations that "substantially burden a person's exercise of religion").  The Constitution expressly prevents the government from interfering with free exercise of religion.  *See* U.S. Const. amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]."); *see also Espinoza v. Mont. Dep't of Revenue*, — S. Ct. —, No. 18-1195, 2020 WL 3518364, at *22 (June 30, 2020) (Gorsuch, J., concurring) (the Free Exercise Clause "protects not just the

16

right to be a religious person, holding beliefs inwardly and secretly; it also protects the right to act on those beliefs outwardly and publicly"). And numerous state and federal laws reflect the unique protections accorded to religion. *See Gaylor v. Mnuchin*, 919 F.3d 420, 436 (7th Cir. 2019) (noting that "more than 2,600 federal and state tax laws provide religious exemptions" and finding a tax exemption for religious housing constitutional (citation omitted)); *see also Hosannah-Tabor*, 565 U.S. at 189 (the First Amendment "gives special solicitude to the rights of religious organizations"). Across the country, individuals have brought free exercise challenges to similar executive orders issued throughout this public health crisis. Supreme Court Justices and Circuit Court judges have been receptive to such challenges. *See S. Bay II*, 140 S. Ct. at 1614 (Kavanaugh, J., dissenting) (state's 25% occupancy cap imposed on religious worship services but not comparable secular businesses discriminates on the basis of religion in violation of the First Amendment and state lacked compelling justification for such distinction); *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (the governor's restriction on in-person worship services likely violates free exercise of religion); *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 946 (9th Cir. 2020) (Collins, J., dissenting) ("By regulating the specific underlying risk-creating behaviors, rather than banning the particular religious setting within which they occur, the State could achieve its ends in a manner that is the least restrictive way of dealing with the problem at hand." (citation omitted)). The President has even indicated that religious houses of worship are essential services and suggested he would "override the governors."[9] Against this backdrop, the Governor concluded that the least restrictive means by which to protect this constitutional right was to permit free religious exercise but encourage individuals who engage

---

[9] *See* Brian Naylor, *Trump Calls on States to Reopen Places of Worship Immediately*, NPR., May 22, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/05/22/861057500/trump-calls-on-states-to-immediately-reopen-places-of-worship.

in such practices to adhere to public health guidelines. The Court finds that this is indeed the least restrictive means by which to accomplish both aims.[10]

Plaintiffs contend that the Governor cannot satisfy the least restrictive means test because a political party caucus is no more likely to spread COVID-19 than a church service. *See* Doc. 3-1 at 12. However, the Constitution does not accord a political party the same express protections as it provides to religion. *See* U.S. Const. amend. I. And by statute, Illinois has undertaken steps to provide additional protections for the exercise of religion. *See* 775 Ill. Comp. Stat. 35/15. Additionally, the Order's limited exemptions reinforce that it is narrowly tailored. The Order only exempts two other functions from the gathering limit: emergency and governmental functions. These narrow exemptions demonstrate that the Order eliminates the increased risk of transmission of COVID-19 when people gather while only exempting necessary functions to protect health, safety, and welfare and free exercise of religion. Therefore, the Governor has carried his burden at this stage in demonstrating that the Order is narrowly tailored to further a compelling interest, and the Order survives strict scrutiny. *See also Amato v. Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788, at *11 (D. Conn. May 19, 2020) (restriction on gathering size with specific exemption for religious services was narrowly tailored under intermediate scrutiny in part because it involved spiritual needs the state may deem more pressing); *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207, at *13 (E.D.N.C. June 8, 2020) (executive order was narrowly tailored under intermediate scrutiny because the

---

[10] Although the Court concludes that the exemption satisfies strict scrutiny, such exemption was not necessary under the Free Exercise Clause. The Seventh Circuit upheld the Governor's previous executive order that limited the size of public assemblies, including religious services, against a free exercise challenge. *See Elim II*, 2020 WL 3249062, at *6. And another court in this district recently found that a challenge under Illinois' RFRA statute was also unlikely to succeed on the merits. *Cassell*, 2020 WL 2112374, at *13 (challenge to previous executive order banning all gatherings greater than ten people under Illinois' RFRA statute unlikely to succeed on the merits). However, this case does not involve a free exercise challenge and neither party suggests that imposing a blanket gathering limit is the least restrictive means by which the Governor could achieve his compelling interest in protecting public health.

government's interest in preventing the spread of COVID-19 would be achieved less effectively if other facilities were able to open). In conclusion, Plaintiffs have failed to show a likelihood of success on the merits of their First and Fourteenth Amendment claims under *Jacobson* or traditional First Amendment analysis.

## II.      Balance of Harms

The balance of harms further confirms that Plaintiffs are not entitled to preliminary relief. Under the sliding scale approach, the less likely Plaintiffs' chance of success the more the balance of harms must weigh in their favor. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Because Plaintiffs' claims have little likelihood of succeeding on the merits, they are not entitled to preliminary relief unless they show that the scales weigh heavily in their favor.

The scales weigh significantly against Plaintiffs. The number of COVID-19 infections continues to rise across the United States, which has led some states to recently impose greater restrictions on gatherings and activities. COVID-19 is highly contagious and continues to spread, requiring public officials to constantly evaluate the best method by which to protect residents' safety against the economy and a myriad of other concerns. *See Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194, at *6 (N.D. Ill. May 13, 2020) ("The record clearly reveals how virulent and dangerous COVID-19 is, and how many people have died and continue to die from it."), *aff'd*, No. 20-1811, 2020 WL 3249062 (7th Cir. June 16, 2020); *Cassell*, 2020 WL 2112374, at *15 ("While Plaintiffs' interest in holding large, communal in-person worship services is undoubtedly important, it does not outweigh the government's interest in protecting the residents of Illinois from a pandemic."). Granting Plaintiffs the relief they seek would pose serious risks to public health. Plaintiffs contend that in-

person speech is most effective, and their communications are hampered by gathering limits. But the current state of our nation demands that we sacrifice the benefits of in-person interactions for the greater good. Enjoining the Order would risk infections amongst members of the Illinois Republican Party and its regional affiliates, as well as their families, friends, neighbors, and co-workers. *See Cassell*, 2020 WL 2112374, at *15. Plaintiffs ask that they be allowed to gather—without limitation—despite the advice of medical experts and the current rise in infections. The risks in doing so are too great. The Court acknowledges that Plaintiffs' interest in gathering as a political party is important, especially leading up to an election. But this interest does not outweigh the Governor's interest in protecting the health of Illinois' residents during this unprecedented public health crisis. Moreover, Plaintiffs may still engage in a number of expressive activities like phone banks, virtual strategy meetings, and, as of Friday, June 26, gatherings like fundraisers and meet-and-greet coffees that do not exceed fifty people. *See* Doc. 3-1 at 4. As the Governor suggested, allowing Plaintiffs to gather would open the floodgates to challenges from other groups that find in-person gatherings most effective. It would also require that the Court turn a blind eye to the increase in infections across a high majority of states, which as of July 1, 2020 includes Illinois.[11] An injunction that allows Plaintiffs to gather in large groups so that they can engage in more effective speech is simply not in the public interest. Such relief would expand beyond any gatherings and negatively impact non-parties by increasing their risk of exposure. Thus, the harms tilt significantly in the Governor's favor as he seeks to prevent the spread of this virulent virus.

---

[11] *Illinois Coronavirus Map and Case Count*, N.Y. Times, July 1, 2020, https://www.nytimes.com/interactive/2020/us/illinois-coronavirus-cases.html (Illinois reported 768 new cases on June 29, compared to 581 on June 28).

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for preliminary relief [3].

Dated: July 2, 2020

_____
SARA L. ELLIS
United States District Judge