CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-2175

ILLINOIS REPUBLICAN PARTY, *et al.*,

*Plaintiffs-Appellants,*

*v.*

J. B. PRITZKER, Governor of Illinois,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20 C 3489 — **Sara L. Ellis**, *Judge.*

———————————

ARGUED AUGUST 11, 2020 — DECIDED SEPTEMBER 3, 2020

———————————

Before WOOD, BARRETT, and ST. EVE, *Circuit Judges.*

WOOD, *Circuit Judge.* As the coronavirus SARS-CoV-2 has raged across the United States, public officials everywhere have sought to implement measures to protect the public health and welfare. Illinois is no exception: Governor J. B. Pritzker has issued a series of executive orders designed to limit the virus's opportunities to spread. In the absence of better options, these measures principally rely on preventing the

transmission of viral particles (known as virions) from one person to the next.

Governor Pritzker's orders are similar to many others around the country. At one point or another, they have included stay-at-home directives; flat prohibitions of public gatherings; caps on the number of people who may congregate; masking requirements; and strict limitations on bars, restaurants, cultural venues, and the like. These orders, and comparable ones in other states, have been attacked on a variety of grounds. Our concern here is somewhat unusual. Governor Pritzker's Executive Order 2020-43 (EO43, issued June 26, 2020) exhibits special solitude for the free exercise of religion.[1] It does so through the following exemption:

> a. **Free exercise of religion**. This Executive Order does not limit the free exercise of religion. To protect the health and safety of faith leaders, staff, congregants and visitors, religious organizations and houses of worship are encouraged to consult and follow the recommended practices and guidelines from the Illinois Department of Public Health. As set forth in the IDPH guidelines, the safest practices for religious organizations at this time are to

---

[1] EO43 was set to expire by its own terms on August 22, 2020, but the Governor issued EO52 on August 21, 2020. See https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-52.aspx.     EO52     extends EO43 in its entirety through September 19, 2020. For convenience, we refer in this opinion to EO43.

> provide services online, in a drive-in format, or out-
> doors (and consistent with social distancing re-
> quirements and guidance regarding wearing face
> coverings), and to limit indoor services to 10 peo-
> ple. Religious organizations are encouraged to take
> steps to ensure social distancing, the use of face
> coverings, and implementation of other public
> health measures.

See EO43, § 4(a), at https://www2.illinois.gov/Pages/Execu-
tive-Orders/ExecutiveOrder2020-43.aspx.    Emergency  and
governmental functions enjoy the same exemption. Other-
wise, EO43 imposes a mandatory 50-person cap on gather-
ings.

The Illinois Republican Party and some of its affiliates
("the Republicans") believe that the accommodation for free
exercise contained in the executive order violates the Free
Speech Clause of the First Amendment. In this action, they
seek a permanent injunction against EO43. In so doing, they
assume that such an injunction would permit them, too, to
congregate in groups larger than 50, rather than reinstate the
stricter ban for religion that some of the Governor's earlier ex-
ecutive orders included, though that is far from assured. Re-
lying principally on *Jacobson v. Massachusetts*, 197 U.S. 11
(1905), the district court denied the Republicans' request for
preliminary injunctive relief against EO43. See *Illinois Repub-
lican Party v. Pritzker*, No. 20 C 3489, 2020 WL 3604106 (N.D.
Ill. July 2, 2020). The Republicans promptly sought interim re-
lief from that ruling, see 28 U.S.C. § 1292(a)(1), but we de-
clined to disturb the district court's order, *Illinois Republican
Party v. Pritzker*, No. 20-2175 (7th Cir. July 3, 2020), and Justice
Kavanaugh in turn refused to intervene. *Illinois Republican*

*Party v. Pritzker*, No. 19A1068 (Kavanaugh, J., in chambers July 4, 2020).

We did, however, expedite the briefing and oral argument of the merits of the preliminary injunction, and we heard argument on August 11, 2020. Guided primarily by the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), we conclude that the district court did not abuse its discretion in denying the requested preliminary injunction, and so we affirm its order.

## I

Before we turn to the heart of our analysis, a word or two about the standard of review for preliminary injunctions is in order. The Supreme Court's last discussion of the subject occurred in *Winter*, where the Court reviewed a preliminary injunction against the U.S. Navy's use of a sonar-training program. *Id.* at 12. It expressed the standard succinctly: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The question in *Winter*, however, just as in our case, is one of degree: *how* likely must success on the merits be in order to satisfy this standard? We infer from *Winter* that a mere possibility of success is not enough. *Id.* at 22.

In the related context of a court's power to stay its own judgment (or that of a lower tribunal), the Court returned to this subject in *Nken v. Holder*, 556 U.S. 418 (2009). There, while noting the "substantial overlap" between the analysis of stays and that of preliminary injunctions, *id.* at 434, the Court

stopped short of treating them identically. It pointed out that, unlike a preliminary injunction, which is an order directed at someone and that governs that party's conduct, "a stay operates upon the judicial proceeding itself." *Id.* at 428. Before such an order should issue, the Court said, the applicant must make a strong showing that she is likely to succeed on the merits. *Id.* at 434. At the same time, following *Winter*, the Court said that a possibility of success is not enough. Neither is a "better than negligible" chance: the Court expressly disapproved that formula, see *id.*, which appears in many of our decisions, including one the Court singled out, *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999). See also, *e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008); *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). We note this to remind both the district courts and ourselves that the "better than negligible" standard was retired by the Supreme Court.

We understand from both *Winter* and *Nken* that an applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case. A "strong" showing thus does not mean proof by a preponderance—once again, that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending. But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case. And it is worth recalling that the likelihood of success factor plays only one part in the analysis. The applicant must also demonstrate that "irreparable injury is likely in the absence of an injunction," see *Winter*,

555 U.S. at 22. In addition, the balance of equities must "tip[] in [the applicant's] favor," and the "injunction [must be] in the public interest." *Id.* at 20.

## II

With this standard in mind, we are ready to turn to the case at hand. We begin by confirming, as we did in *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020), that the possibility that EO43 may change in the coming days or weeks does not moot this case. The Governor has made clear that the virus is a moving target: if possible, he will open up the state (or certain regions of the state) further, but if the criteria to which the state is committed take a turn for the worse, he could reinstate more stringent measures. See *id.* at 344–45. Our mootness analysis in *Elim* thus applies with full force to this case.

The next question relates to the overall validity of EO43 and orders like it, which have been issued in the midst of a general pandemic. As we noted in *Elim*, the Supreme Court addressed this type of measure more than a century ago, in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The district court appropriately looked to *Jacobson* for guidance, and so do we. The question the Court faced there concerned vaccination requirements that the City of Cambridge had put in place in response to a smallpox epidemic. The law made an exception for children who had a physician's certificate stating that they were "unfit subjects for vaccination," *id.* at 12, but it was otherwise comprehensive. Faced with a lawsuit by a man who did not wish to be vaccinated, and who contended that the City's requirement violated his Fourteenth Amendment right to liberty, the Court ruled for the City. In so doing, it held that it was appropriate to defer to the City's assessment of the

value of vaccinations—an assessment, it noted, that was shared "by the mass of the people, as well as by most members of the medical profession … and in most civilized nations." *Id.* at 34. It thus held that "[t]he safety and the health of the people of Massachusetts are, in the first instance, for that commonwealth to guard and protect," and that it "[did] not perceive that this legislation has invaded any right secured by the Federal Constitution." *Id.* at 38.

At least at this stage of the pandemic, *Jacobson* takes off the table any general challenge to EO43 based on the Fourteenth Amendment's protection of liberty. Like the order designed to combat the smallpox epidemic, EO43 is an order designed to address a serious public-health crisis. At this stage in the present litigation, no one is alleging that the Governor lacks the power to issue such orders as a matter of state law. Instead, our case presents a more granular challenge to the Governor's action—one that focuses on his decision to subject the exercise of religion only to recommended measures, rather than mandatory ones. We must decide whether that distinction is permissible.

Normally, parties challenging a state measure that appears to advantage religion invoke the Establishment Clause of the First Amendment (assuming for the sake of discussion that the challengers can establish standing to sue). That is emphatically not the theory that the Republicans are pursuing. We eliminated any doubt on that score at oral argument, where counsel assured us that this was not their position. As we explain in more detail below, the Republicans argue instead that preferential treatment for religious exercise conflicts with the interpretation in *Reed v. Gilbert*, 576 U.S. 155 (2015), of the Free Speech Clause of the same amendment. A

group of 100 people may gather in a church, a mosque, or a synagogue to worship, but the same sized group may not gather to discuss the upcoming presidential election. The Republicans urge that only the content of the speech distinguishes these two hypothetical groups, and as they see it, *Reed* prohibits such a line.

Our response is to say, "not so fast." A careful look at the Supreme Court's Religion Clause cases, coupled with the fact that EO43 is designed to give *greater* leeway to the exercise of religion, convinces us that the speech that accompanies religious exercise has a privileged position under the First Amendment, and that EO43 permissibly accommodates religious activities. In explaining that conclusion, we begin with a look at the more conventional cases examining the interaction of the two Religion Clauses. We then take a close look at *Reed*, and we conclude by explaining that a comparison between ordinary speech (including political speech, which all agree lies at the core of the First Amendment) and the speech aspect of religious activity reveals something more than an "apples to apples" matching. What we see instead is "speech" being compared to "speech plus," where the "plus" is the protection that the First Amendment guarantees to religious exercise. Even though we held in *Elim* that the Governor was not compelled to make this accommodation to religion, nothing in *Elim*, and nothing in the Justices' brief writings on the effect of coronavirus measures on religion, says that he was forbidden to carve out some space for religious activities. See *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020); *Calvary Chapel Dayton Valley v. Sisolak*, No. 19A1070, 2020 WL 4251360 (U.S. July 24, 2020).

No. 20-2175                                             9

A

Although there is a long history and rich literature dealing with the two Religion Clauses, it is enough here for us to begin with the Supreme Court's more recent decisions upholding legislation that gives religion a preferred position. We start with *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987). In that case, several people who were fired from church-owned corporations solely because they were not church members sued the church under Title VII of the Civil Rights Act of 1964; their theory was that the church had engaged in impermissible discrimination on the basis of religion. The case would have had some legs if an ordinary employer had decided to sack all its Catholic, or Jewish, or Presbyterian employees. After all, section 703(a) of Title VII specifies that it is "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual [in a variety of ways] because of such individual's … religion … ." 42 U.S.C. § 2000e-2(a).

But that is not all the statute says. Section 702 states that the law does not apply to "a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion to perform [the institution's work]." 42 U.S.C. § 2000e-1(a); see also Civil Rights Act of 1964, Title VII, § 703(e), 42 U.S.C. § 2000e-2(e). The plaintiffs in *Amos* contended that the exemption permitting religious employers to discriminate on religious grounds violates the Establishment Clause. The Supreme Court rejected this theory and held that the Establishment Clause permits accommodations designed to allow free exercise of religion. The Court's opinion stresses that it is permissible for the

government to grant a benefit to religion when the purpose of
the benefit is simply to facilitate noninterference with free ex-
ercise:

> This Court has long recognized that the govern-
> ment may (and sometimes must) accommodate reli-
> gious practices and that it may do so without violating
> the Establishment Clause. It is well established, too,
> that the limits of permissible state accommodation to
> religion are by no means co-extensive with the nonin-
> terference mandated by the Free Exercise Clause.
> There is ample room under the Establishment Clause
> for benevolent neutrality which will permit religious
> exercise to exist without sponsorship and without in-
> terference.

483 U.S. at 334 (cleaned up).

Lest there be any doubt, the Court repeated that it had
"never indicated that statutes that give special consideration
to religious groups are *per se* invalid." *Id.* at 338. Using the ru-
bric of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which was then
widely accepted, the Court found that the legislature was en-
titled to enact a measure designed to alleviate governmental
interference with the internal affairs of religious institutions,
and that such a law did not have a forbidden primary effect
of advancing religion. Finally, and interestingly for our case,
the Court rejected Amos's assertion that the religious exemp-
tion violated the Equal Protection Clause. A statute otherwise
compatible with the Establishment Clause that "is neutral on
its face and motivated by a permissible purpose of limiting
governmental interference with the exercise of religion," 483
U.S. at 339, had to satisfy only rational-basis scrutiny for

Equal Protection purposes. Section 702, the Court held, easily passed that bar.

Another case in which the Court addressed measures that give special solicitude to the free exercise of religion was *Cutter v. Wilkinson*, 544 U.S. 709 (2005). That case involved a clash between state prisoners who alleged infringements of their right to practice their religion—guaranteed by both the Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a)(1)–(2)—and prison officials, who asserted that the accommodations required by RLUIPA violated the Establishment Clause. RLUIPA was passed in response to *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that the Free Exercise Clause does not prohibit states from enforcing laws of general applicability that incidentally burden religion.[2] Congress first struck back with the Religious Freedom Restoration Act (RFRA), Pub. L. No. 103-141, 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb–2000bb-4), in an effort to require a more robust justification for laws burdening religious exercise, but the Supreme Court held in *City of Boerne v. Flores*, 521 U.S. 507 (1997), that RFRA could not be applied to the states. Congress's next answer was RLUIPA, which affects only land-use and institutionalized persons, but because of the tie to federal funding, avoids the

---

[2] We are aware that the Supreme Court has granted certiorari in *Fulton v. City of Philadelphia*, No. 19-123, 140 S. Ct. 1104 (2020), and that one of the questions presented in that case is whether *Smith* should be reconsidered. We doubt that the outcome of *Fulton* will have any effect on this case, and in any event, we remain bound by *Smith* until the Supreme Court instructs otherwise.

Case: 1:20-cv-03489 Document #: 29 Filed: 09/25/20 Page 12 of 22 PageID #:227

constitutional flaws the Court found in RFRA as applied to state institutions.

The *Cutter* plaintiffs were Ohio prisoners who adhered to a variety of nonmainstream religions, such as Satanism, Wicca, and Asatru. They complained that the prison was impeding their religious practices in a number of ways, including by denying access to religious literature, restricting opportunities for group worship, withholding the right to follow dress and appearance rules, and not engaging the services of a chaplain. The defendants did not deny these allegations; they argued instead that they were under no obligation to deviate from their general policies. RLUIPA, they said, improperly advances religion to the extent that it required these types of affirmative measures.

As in *Amos*, the Supreme Court held that the state "may … accommodate religious practices … without violating the Establishment Clause." *Id.* at 713 (alterations in original) (internal quotation omitted). It reiterated its comment in *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 669 (1970), that "there is room for play in the joints" between the Free Exercise and Establishment Clauses. 544 U.S. at 713, 719. RLUIPA, it then said, lies within the "space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Id.* at 719. It offered this explanation for its holding:

> Foremost, we find RLUIPA's institutionalized-persons provision compatible with the Establishment Clause because it alleviates exceptional government-created burdens on private religious exercise. See *Board of Ed. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994) (government need not "be

oblivious to impositions that legitimate exercises of
state power may place on religious belief and prac-
tice") … .

544 U.S. at 720. It is noteworthy in this connection that the
predicate for the religious accommodation is a *legitimate* exer-
cise of state power, albeit one that burdens religion. Much the
same can be said of the coronavirus measures now before us.

The third case we find helpful is *Hosanna-Tabor Evangelical
Lutheran Church & School v. Equal Employment Opportunity
Commission*, 565 U.S. 171 (2012). There the Court returned to
the employment setting, this time examining an action
brought by the EEOC against a church and its associated
school. The EEOC asserted that the school had fired a teacher
in retaliation for her threat to file a lawsuit under disability-
discrimination laws; the school responded that its reason for
firing her was that her threat to sue was a breach of the tenets
of its faith. The central issue, however, involved the teacher's
status: if she was properly characterized as a "minister" of the
faith, then the First Amendment barred the EEOC's suit; if she
was instead a lay employee, the parties assumed that the case
could go forward. See also *Our Lady of Guadalupe Sch. v. Mor-
rissey-Berru*, 140 S. Ct. 2049 (2020) (extending *Hosanna-Tabor* to
teachers responsible for instruction in the faith, regardless of
their specific title or training).

In this instance, the Court found that the Free Exercise
Clause and the Establishment Clause pointed in the same di-
rection—both mandate noninterference "with the decision of
a religious group to fire one of its ministers." 565 U.S. at 181.
It endorsed the idea of a "ministerial exception" to the other-
wise applicable laws regulating employment relationships.
*Id.* at 188. But, in responding to the EEOC's argument that no

ministerial exception is needed, because religious organizations enjoy the right to freedom of association under the First Amendment, the Court offered guidance on the way the different branches of the First Amendment interact:

> We find this position [*i.e.*, that the general right to freedom of association takes care of everything] untenable. The right to freedom of association is a right enjoyed by religious and secular groups alike. It follows under the EEOC's and Perich's view that the First Amendment analysis should be the same, whether the association in question is the Lutheran Church, a labor union, or a social club. … That result is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations. We cannot accept the remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers.

*Id.* at 189. In other words, the Religion Clauses are doing some work that the rest of the First Amendment does not. Whether that extra work pertains only to the implied right to freedom of association (not mentioned in so many words in the text of the amendment) or if it applies also to the right to freedom of speech, is the question before us. In order to answer it, we must examine the primary free-speech case on which the Republicans rely, *Reed v. Gilbert*.

B

*Reed* involved the regulation of signs in the town of Gilbert, Arizona. 576 U.S. at 159. Gilbert's municipal code regulated signs based on the type of information they conveyed,

and this turned out to be its fatal flaw. Signs designated as "Temporary Directional Signs Relating to a Qualifying Event" were regulated more restrictively than signs conveying other messages, including signs that were deemed to be "Ideological Signs" or "Political Signs." *Id.* at 159–60. The case arose when a small church and its pastor wanted to erect temporary signs around the town on Saturdays. Because the church had no permanent building, it needed a way to inform interested persons each week about where it would hold its Sunday services. *Id.* at 161.

The problem was that the church's signs did not comply with the Code, which dictated size, permissible placement spots, number per single property, and display duration. This prompted the Town's Sign Czar to cite the church twice for Code violations. After efforts at a mutually satisfactory approach failed, the church sued the Town, claiming that the Code abridged its right to free speech in violation of the First Amendment, made applicable to the states through the Fourteenth Amendment. Both the district court and the court of appeals (over the course of a couple of rounds) ruled in favor of the Town, because as they saw it, the Code "did not regulate speech on the basis of content." *Id.* at 162. The Supreme Court reversed.

The Court recognized two types of content-based regulations: first, regulation based on the content of the topic discussed or the idea or message expressed, *id.* at 163; and second, regulation that is facially content neutral, but that "cannot be justified without reference to the content of the regulated speech," *id.* at 164 (cleaned up). The Town's Code, the Court held, fell in the first category because it treated signs differently depending on their communicative content:

If a sign informs its reader of the time and place a
book club will discuss John Locke's Two Treatises of
Government, that sign will be treated differently from
a sign expressing the view that one should vote for one
of Locke's followers in an upcoming election, and both
signs will be treated differently from a sign expressing
an ideological view rooted in Locke's theory of govern-
ment. More to the point, the Church's signs inviting
people to attend its worship services are treated differ-
ently from signs conveying other types of ideas. On its
face, the Sign Code is a content-based regulation of
speech.

*Id.*

Entirely missing from *Reed* is any argument about, or dis-
cussion of, the way in which these principles apply to Free
Exercise cases. That is probably because if the Town was do-
ing anything, it was disadvantaging the church's effort to pro-
vide useful information to its parishioners, not lifting a bur-
den from religious practice. The only governmental interests
the Town offered in support of its Code were "preserving the
Town's aesthetic appeal and traffic safety." *Id.* at 171. The
Court found those interests to be woefully lacking, falling far
short of a compelling state interest and a narrowly tailored
response. *Id.* at 172. In order to make *Reed* comparable to the
case before us, we would need to postulate a Sign Code that
restricted temporary directional signs for everyone *except*
places of worship, and that left the latter free to use whatever
signs they wanted. But that is not what *Reed* was about, and
so we must break new ground here.

## C

We will assume for the sake of argument that free exercise of religion involves speech, at least most of the time. One can imagine religious practices that do not involve words, such as a silent prayer vigil, or a pilgrimage or hajj to a sacred shrine, or even the act of wearing religiously prescribed clothing. Perhaps in some instances those actions would qualify as symbolic speech, see, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404 (1989), but others would not. Nonetheless, we recognize the importance of words to most religious exercise, whether those words appear in a liturgy, or in the lyrics to sacred music, or in a homily or sermon. And we understand the point the Republicans are making: EO43 draws lines based on the purpose of the gathering, and the type of speech that is taking place sheds light on that purpose. Someone sitting in a place of worship for weekly services is allowed to be part of a group larger than 50, but if the person in the front of the room is talking about a get-out-the-vote effort or is giving a lecture on the Impressionists, no more than 50 attendees are permitted. (Some of the Republicans' other hypotheticals are a little more strained: if the 23rd Psalm is the scriptural passage for the Sabbath or a Sunday service for one group, and another group wants to use the identical text for a discussion of ancient poetry, is the different treatment based on content or something else?)

But the Free Exercise Clause has always been about more than speech. Otherwise, why bother to include it at all—the First Amendment already protects freedom of speech, and we know that speech with a religious message is entitled to just as much protection as other speech. See *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 837 (1995).

Moreover, the *Rosenberger* Court held, nondiscriminatory financial support for religious organizations would not run afoul of the Establishment Clause, because the program was neutral toward religion. *Id.* at 840. Indeed, the Court acknowledged, it was "something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought." *Id.* at 831.

However one wishes to characterize religion (including the decision to refrain from identifying with any religion), there can be no doubt that the First Amendment singles out the free exercise of religion for special treatment. Rather than being a mechanism for expressing views, as the speech, press, assembly, and petition guarantees are, the Free Exercise Clause is content based. The mixture of speech, music, ritual, readings, and dress that contribute to the exercise of religions the world over is greater than the sum of its parts.

The Supreme Court made much the same point in *Hosanna-Tabor*, as we noted earlier, when it responded to the argument that the general right to freedom of association sufficed to protect religious groups, and thus there was no need for a ministerial exception to the employment discrimination rules. If that were true, the Court said, then there would be no difference between the associational rights of a social club and those of the Lutheran Church. 565 U.S. at 189. "That result," the Court wrote, "is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." *Id.*

Just so here. The free exercise of religion covers more than the utterance of the words that are part of it. And, while in the face of a pandemic the Governor of Illinois was not compelled to make a special dispensation for religious activities, see

*Elim*, nothing in the Free Speech Clause of the First Amendment barred him from doing so. As in the cases reconciling the Free Exercise and Establishment Clauses, all that the Governor did was to limit to a certain degree the burden on religious exercise that EO43 imposed.

We stress that this does not mean that anything a church announces that it wants to do is necessarily protected. If the church wants to hold a Labor Day picnic, or a synagogue wants to sponsor a "Wednesday night at the movies" event, or a church decides to host a "battle of the bands," the church or synagogue would be subject to the normal restrictions of 50 people or fewer. We have no occasion here to opine on where the line should be drawn between religious activities and more casual gatherings, but such a line surely exists. And it is important to recall that EO43 does not say that all activities of religious organizations are exempt from its strictures. Only the "free exercise of religion" is covered, and those words, taken directly from the First Amendment, provide a limiting principle.

Because the exercise of religion involves more than simple speech, the equivalency urged on us by the Republicans between political speech and religious exercise is a false one. *Reed* therefore does not compel the Governor to treat all gatherings alike, whether they be of Catholics, Lutherans, Orthodox Jews, Republicans, Democrats, University of Illinois alumni, Chicago Bears fans, or others. Free exercise of religion enjoys express constitutional protection, and the Governor was entitled to carve out some room for religion, even while he declined to do so for other activities.

### III

Before concluding, we must also comment on the Republicans' alternative argument: that the Governor is allowing Black Lives Matter protestors to gather in groups of far more than 50, but he is not allowing the Republicans to do so. They concede that their argument depends on practice, not the text of the executive order. The text contains no such exemption, whether for Black Lives Matter, Americans for Trump, Save the Planet, or anyone else. Should the Governor begin picking and choosing among those groups, then we would have little trouble saying that *Reed* would come into play, and he would either have to impose the 50-person limit on all of them, or on none of them.

The fact that the Governor expressed sympathy for the people who were protesting police violence after the deaths of George Floyd and others, and even participated in one protest, does not change the text of the order. Nonetheless, the Republicans counter, there are *de facto* changes, even if not *de jure* changes. Essentially, they charge that the state should not be leaving enforcement up to the local authorities, and that they are aggrieved by the lax or even discriminatory levels of enforcement that they see. Underenforcement claims are hard to win, however, as we know from cases such as *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989). It is also difficult to prevail in a case accusing the police of racial profiling. See, *e.g.*, *Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001). Although we do not rule out the possibility that someone might be able to prove this type of favoritism in the enforcement of an otherwise valid response to the COVID-19 pandemic, the record in this case falls short.

Indeed, the problems of late have centered on ordinary criminal mobs looting stores, not on peaceful protestors.

The Republicans' brief offers only slim support for the proposition that the 50-person ban on gatherings does not apply to the Black Lives Matters speakers. It first points out that the Governor issued a press release expressing sympathy for the protests. But such a document, untethered to any legislative or executive rule-making process, cannot change the law. *Cf. Medellin v. Texas*, 552 U.S. 491, 523–32 (2008) (holding that President George W. Bush's memorandum in response to an international court's decision was "not a rule of domestic law binding in state and federal courts"). The Republicans also complain that the Chicago police stood by idly while the Black Lives Matters protests took place, but that they dispersed "Reopen Illinois" gatherings. Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination.

Finally, the Republicans contend that the Governor promised that the National Guard troops he deployed to Chicago would not "interfere with peaceful protesters' first amendment rights." Aside from the fact that this argument appears for the first time in their Reply Brief and is thus waived, it is unpersuasive. The Governor made clear that the National Guard was deployed to protect property against unrest, not to enforce the COVID-19 order. He did not single out any category of protester by message. We conclude that the district court did not abuse its discretion when it found that none of these allegations sufficed to undermine the Governor's likelihood of success on the merits, or for that matter to undercut his showing that the state would suffer irreparable harm if EO43 were set aside.

## IV

We conclude with some final thoughts. The entire premise of the Republicans' suit is that if the exemption from the 50-person cap on gatherings for free-exercise activities were found to be unconstitutional (or if it were to be struck down based on the allegedly ideologically driven enforcement strategy), they would then be free to gather in whatever numbers they wished. But when disparate treatment of two groups occurs, the state is free to erase that discrepancy in any way that it wishes. See, *e.g.*, *Stanton v. Stanton*, 429 U.S. 501, 504 n.4 (1977) ("[W]e emphasize that Utah is free to adopt either 18 or 21 as the age of majority for both males and females for child-support purposes. The only constraint on its power to choose is … that the two sexes must be treated equally."). In other words, the state is free to "equalize up" or to "equalize down." If there were a problem with the religious exercise carve-out (and we emphasize that we find no such problem), the state would be entitled to return to a regime in which even religious gatherings are subject to the mandatory cap. See *Elim*, 962 F.3d 341. This would leave the Republicans no better off than they are today.

We AFFIRM the district court's order denying preliminary injunctive relief to the appellants.